

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-08-00126-CR

_____

ANTONIO MARQUISE JACKSON, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 4th Judicial District Court
Rusk County, Texas
Trial Court No. CR07-109

Before Morriss, C.J., Carter and Moseley, JJ.
Opinion by Justice Moseley

OPINION

An excess of post-adolescent testosterone, a lack of discretion, and rampant bravado can combine to create a toxic brew which destroys those who partake of it. In this circumstance, this kind of poisonous concoction resulted in the death of Justin Berry and the conviction by a jury of Antonio Marquise Jackson of manslaughter, for which Jackson was sentenced to fifteen years in prison and fined $10,000.00.

On appeal, Jackson raises a single point of error: that the jury charge at the guilt/innocence stage of his trial contained language specifying that manslaughter was a second-degree felony.

The jury was also charged on deadly conduct, which the parties at the time incorrectly believed to be a lesser-included offense of manslaughter. That "lesser" charge was (correctly) labeled in the charge as a third-degree felony.

Jackson maintains that the inclusion of the punishment classification of the two offenses in the guilt/innocence charge amounted to an improper comment on the weight of the evidence.

There was no objection to the charge at trial. Therefore, under the requisite *Almanza* analysis, we first review the charge to determine if there is error; if that finding is made and there was no preserved complaint to the charge made by the defendant to it at trial, we then determine whether any egregious harm resulted to the defendant.[1]

---

[1]*Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g).

**Is there error?**

The relevant portions of the charge read as follows:

> A person commits the offense of manslaughter, a 2nd Degree Felony, if he recklessly causes the death of an individual.
>
> . . . .
>
> A person commits the offense of deadly conduct, a 3rd Degree Felony, if he knowingly discharges a firearm at or in the direction of a vehicle and is reckless as to whether the vehicle is occupied.

Jackson argues that the error in the charge invites the jury to weigh punishment for conduct before he is found guilty of conduct deserving punishment. As counsel has pointed out, there is authority holding that a charge is objectionable if it instructs the jury about matters not at issue during that particular phase of the proceeding. *Timmons v. State*, 586 S.W.2d 509, 510 n.1 (Tex. Crim. App. [Panel Op.] 1979); *see Staggs v. State*, 503 S.W.2d 587 (Tex. Crim. App. 1974) (holding it to be error to inform jury about information on punishment at the guilt/innocence stage—but not harmful). This reasoning is consistent with Articles 36.14–36.16, which generally require the charge to be one setting out the law applicable to the case. TEX. CODE CRIM. PROC. ANN. art. 36.14 (Vernon 2007), arts. 36.15–.16 (Vernon 2006). In a bifurcated trial, punishment is not part of the law applicable at the guilt/innocence stage of trial. Thus, to improperly expand the charge on guilt/innocence to include elements of the punishment stage of the proceeding is error.[2]

---

[2]We note without comment or expansion that one of our sister courts has determined that "We hold that the trial court did not err by informing the jury of the degree of the offense. Even if such an instruction was not required, the degree of the offense was merely a part of the general

**Egregious harm?**

To determine "egregious harm," a reviewing court examines the entire jury charge, the state of the evidence, including the contested issues and weight of the probative evidence, the arguments of counsel, and any other relevant information revealed by the record of the trial as a whole. The appellant must have suffered actual, rather than theoretical, harm. Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or "vitally affect a defensive theory." *Warner v. State*, 245 S.W.3d 458, 462 (Tex. Crim. App. 2008).

Most cases involving a complaint of this nature involve the provision of too much information to a jury panel during voir dire. Those cases, however, typically involve possible enhancements that might make the range extend higher. We discussed the state of the law in that regard recently in *Hart v. State*, 173 S.W.3d 131 (Tex. App.—Texarkana 2005, no pet.).

> The Texas Court of Criminal Appeals has stated repeatedly that both the state and the accused have the right to inform the jury of the range of punishment applicable to an offense, including a range that is enhanced, and to qualify the panel on the full range of punishment. *Martinez v. State*, 588 S.W.2d 954, 956 (Tex. Crim. App. [Panel Op.] 1979); *Bevill v. State*, 573 S.W.2d 781, 783 (Tex. Crim. App. 1978). Under this formulation, the state may inform the jury panel of the range of punishment applicable if the state was to prove a prior conviction for enhancement purposes, but the state may not inform the jury of any specific allegations contained in an enhancement paragraph of a particular defendant's indictment. *Frausto v. State*, 642 S.W.2d 506, 509 (Tex. Crim. App. [Panel Op.] 1982); *Estes v. State*, 873 S.W.2d 771, 773 (Tex. App.—Fort Worth 1994, pet. ref'd).

*Id*. at 142.

definition and description of that offense as could properly be set forth in the jury charge." *Smith v. State*, 761 S.W.2d 546, 549 (Tex. App.—Corpus Christi 1988, no pet.).

In this case, at the beginning of voir dire, the trial court stated categorically that "Mr. Jackson is charged with the offense of manslaughter, a second degree felony, and the offense is alleged to have occurred on the 8th day of January, 2007, in Rusk County, Texas, and the individual whose death was caused at that time was named Justin Berry." Later, the court informed the jury that the range of punishment for a second-degree felony is from community supervision or two to twenty years' imprisonment and a $10,000.00 fine.

As previously pointed out, it is apparent that the degree of the crime (and thus the severity of potential punishment) is, at best, not relevant to the guilt/innocence proceeding, and any mention of that should be excised from the charge upon proper objection.

However, given the fact that the jury had already been made aware of all this information from the very outset of the trial, it is difficult to imagine how a later delivery of the same information by including it in the charge on guilt/innocence could be harmful. Certainly, even if there is some kind of harm to be conjured, that harm would not intrinsically rise to the level of being egregious.

**In the context of the trial as a whole:**

The evidence seems to indicate that the incident giving rise to the killing was the result of figurative chest-beating, an activity often likely to simultaneously lower the intelligence quotient of those engaged in it while it raises the potential for purposeless violence. While driving around the streets of Henderson with two of his friends, Taylor Haydel saw another car drive past with a load of young males making obscene gestures and screaming obscenities at him. Rather than ignore these

5

antics, Haydel attempted to follow them, but lost their spoor. Later, while driving home, he recognized the car which had been carrying the offenders parked by a residence. He stopped his automobile and proceeded alone to the house where the car was parked; he was confronted there by Zack Wheeler (the driver of the car he had seen earlier) and seven of Wheeler's companions.

Wheeler attempted to goad Haydel into a fight.[3] Haydel, briefly demonstrating the solitary incidence of a semblance of restraint and intelligence of this entire sordid affair, managed to extricate himself and drive away. He called the police and reported the incident, but did not pursue the matter when they made it clear that the matter was of little importance to them. Haydel then drove to Tyler with his friends to the mall and to see a movie.

Wheeler called Haydel later that day and made threats to Haydel. Haydel posited that the threatening call might have been prompted by the fact that Wheeler's girlfriend, Sandy Bowman, came over to Haydel's because Wheeler was doing "a lot of drugs and . . . threatened to beat her," so she absented herself for awhile so he could "chill."

After multiple telephone calls and texts were exchanged over several days, they decided to fight and they ultimately decided to bring along assistance for a three-on-three melee at the local American Legion parking lot.

---

[3]The details of how this goading was effected are in dispute. Wheeler testified that he struck Haydel in the face and knocked Haydel ten feet off the porch, but Haydel maintained that Wheeler struck him in the back of the head as he was leaving the porch.

Things escalated even further. Thinking that the other side might not respect Marquis of Kingsbury rules in the anticipated brawl, Haydel stashed a pistol (belonging to Jackson) under the seat of his car. Unfortunately, Haydel's fears proved to not be idle. The flames of hostility were apparently fanned even further during the intervening period and both sides showed up at the designated time and place with considerably more combatants than the agreed-upon three. Shortly after the two sides arrived, a general free-for-all battle commenced.

The nature of the testimony about what ensued is as conflicting as one might expect when confusion reigned. It is fairly clear that at some point, one of Haydel's teammates yelled to get the gun; someone complied with that request, shooting the pistol at the other gang until the clip was empty. In the midst of the shooting, Berry, the driver of the car which bore the Wheeler side, drove the car at a high rate of speed at the Haydel group's car. As he was driving in that direction, he was struck by a bullet and was killed but managed to crash the car he was driving into the Haydel group's vehicle (nearly crushing Haydel between the cars).

There is testimony that Jackson triggered the shots and that the pistol was lethal.

During voir dire, the State only alluded to range of punishment for manslaughter, and both at opening and during final arguments, argued at length that this was not a mere "deadly conduct" case.

Although the charge contains error, under this state of the facts and the procedural posture of this case, we find no reason why the error would egregiously harm the defendant in this case.

7

We affirm.

Bailey C. Moseley
Justice

Date Submitted:     April 2, 2009
Date Decided:       April 16, 2009

Publish